# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| **UNITED STATES OF AMERICA,** : | |
| : | No. 18-cr-00140-VLB-11 |
| **V.** : | |
| : | |
| **RAMON SANCHEZ** : | April 22, 2020 |
| **Defendant.** : | |
| : | |

**Ruling and Order Granting Defendant's Motion for Reduction of Sentence [Dkt. 601]**

Before the Court is Defendant Ramon Sanchez's Motion to Designate for Compassionate Release and/or Community Corrections pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A). [Dkts. 601 (Mot.), 601-1 (Mem. Supp. Mot.)]. Mr. Sanchez, who has just under 13 months remaining on his 34-month sentence, seeks a modification of his sentence from incarceration to home confinement based on his risk of complications should he contract COVID-19 while incarcerated at MDC Brooklyn. The Government opposes Mr. Sanchez's motion on the grounds that the Court does not have authority to grant it as Mr. Sanchez has not exhausted his administrative remedies and fewer than 30 days have passed since he requested for the Bureau to move for his release [Dkt. 608]. Mr. Sanchez replies. [Dkt. 612]. For the reasons set forth below, the Court grants Mr. Sanchez's motion.

   I.   **Procedural and Factual Background**
       A. *Case Background*

Mr. Sanchez was indicted in the instant case on June 28, 2018. [Dkt. 15]. On July 3, 2018, the Court (Richardson, M.J.) ordered him detained because the Government had proven by clear and convincing evidence that no condition or combination of conditions of release would assure the safety of any other person or the community. [Dkt. 25]. On September 26, 2018, the Court (Richardson, M.J.) denied Mr. Sanchez's motion for bail, [Dkt. 147], and on October 18, 2018, the Court (Richardson, M.J.) denied Mr. Sanchez's second motion for bail. [Dkt. 155].

On August 1, 2019, Mr. Sanchez entered a guilty plea to violations of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C)). [Dkt. 314]. On December 12, 2019, the Court sentenced Mr. Sanchez to thirty-four months in the custody of the Bureau of Prisons, followed by three years of Supervised Release. [Dkt. 497].

Mr. Sanchez is currently housed at MDC Brooklyn. He has been detained for a little over 21 months. On April 3, 2020, Mr. Sanchez (through counsel) filed a request to the Warden of MDC-Brooklyn for immediate release, so only 19 days have passed since he filed his request. [Dkt. 601-1 (Apr. 3, 2020 Letter to Warden)]. Mr. Sanchez has not received a response from the Warden. *See* [Dkts. 617, 617-1 (Ex. H: Apr. 4, 2020 Follow-Up), 617-2 (Ex. I:  Apr. 10, 2020 Follow-Up), 622-1 (Ex J: Apr. 15, 2020 Follow-Up); 628 (Apr. 15 Follow-Up Call).].

    B. <u>COVID-19 Background</u>

As of the date of this decision, over 805,000 people in the United States have tested positive for the virus. *Coronavirus in the U.S.: Latest Map and Case Count*,

N.Y.Times, Apr. 21, 2020.[1]  At least 40,316 patients with the virus have died in the United States. *Id.*

The Court recognizes that correctional and detention facilities "present unique challenges for control of COVID-19 among incarcerated/detained persons, staff, and visitors." *Guidance for Correctional and Detention Facilities,* Centers for Disease Control and Prevention: Coronavirus Disease 2019 (COVID-19) (March 23, 2020).[2]  In these settings, recommended social distancing and hygiene precautions are more difficult to practice. *Id.*

In recent weeks, federal prisons have undertaken numerous precautions to prevent the spread of COVID-19, and while they have made an impact, the precautions have not been entirely successful. As of the date of this opinion, 153,776 federal inmates were housed in institutions managed by the Bureau of Prisons or community-based facilities. *Covid-19 Coronavirus*, Bureau of Prisons (Apr. 21, 2020).[3] There are 540 federal inmates and 323 BOP staff who have tested positive for COVID-19. *Id.* 220 inmates have recovered from the virus and 49 staff have recovered, while 23 inmates have died. *Id.* Thus, almost 1.5 in 10,000 federal inmates has died due to COVID-19, and there is 4.42% mortality rate among individuals who have contracted COVID-19 in federal custody. *Id*.  These numbers

---

[1] **Available at: https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html**
[2] **Available at: https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html. (last visited: April 21, 2020).**
[3] **Available at: https://www.bop.gov/coronavirus/**

are sobering and, on a population proportion basis, somewhat higher than those for the U.S. population.[4]

Brooklyn MDC, where, Mr. Sanchez is housed, reports that two inmates and twenty-three staff members have tested positive for COVD-19. *Id.* There have been no fatalities to date. *Id.*

### C. Mr. Sanchez's Health

Mr. Sanchez suffers from lupus, specifically systematic lupus erythematosus and lupus nephritis, and Raynaud's syndrome. He was first diagnosed at age 17. [Dkt. 477 (Presentence Investigation Report) at ¶ 77]. By 2013, his condition had advanced to Class IV. *Id.* at ¶¶77-79. "Systemic lupus erythematosus is an inflammatory connective tissue disease with variable features." *515390 Systemic Lupus Erythematosus (SLE)*, Stedmans Medical Dictionary (2014). It is a "prototype" systemic autoimmune disease, "characterized by the presence of autoantibodies responsible for immunopathologically mediated tissue lesions." *258370 Systemic Autoimmune Diseases*, Stedmans Medical Dictionary (2014). Mr. Sanchez is prescribed cholecalciferol (Vitamin D3); hydroxychloroquine, 200mg tablet twice a day; Lisinopril, 40mg once a day;

---

[4] **Approximately 3.5 in 1,000 prisoners in the Bureau's custody have tested positive for COVID-19. By comparison, 2.3 in 1,000 people in United States have tested positive. Sources:** *Covid-19 Coronavirus*, **Bureau of Prisons (Apr. 21, 2020);** *Population Statistics,* **Bureau of Prisons (Apr. 21, 2020);** *Coronavirus in the U.S.: Latest Map and Case Count*, **N.Y.Times, Apr. 21, 2020;** *U.S. and World Population Clock*, **United States Census Bureau, (Apr. 21, 2020), https://www.census.gov/popclock/ .**

mycophenolate, 500mg twice a day, and has previously taken prednisone, 5 mg tablet. [Dkt. 477 at ¶ 79].

### D. Interaction of Mr. Sanchez's Health Conditions and COVID-19

The CDC identifies "people who are immunocompromised" as among those who "might be at higher risk for severe illness from COVID-19." People who are at higher risk, *Centers for Disease Control and Prevention: Coronavirus Disease 2019 (COVID-19)* (Apr. 15, 2020).[5] The CDC notes that a person may be immunocompromised because of "prolonged use of corticosteroids and other immune weakening medications." *Id.* Mr. Sanchez currently takes one such drug, mycophenolate mofetil, and has in the past taken another, prednisone. *See mycophnenalte mofetil*, Attorney's Dictionary of Medicine (2019) ("an immunesuppressive agent used to prevent organ rejection following transplant surgery); *see prednisone, classification of*, Attorney's Dictionary of Medicine (2019) ("(1) glucocorticoid. (2) adrenocorticosteroid."). In addition, early research suggests that lupus itself may be a risk factor for an increased chance of infection and for development of a more severe form of COVID-19.[6]

---

[5] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

[6] *See* Amr H. Sawalha et al, *Epigenetic dysregulation of ACE2 and interferon-regulated genes might suggest increased COVID-19 susceptibility and severity in lupus patients*, Clinical Immunology (2020): 108410, https://www.sciencedirect.com/science/article/pii/S1521661620302394 ("propos[ing] that lupus patients might be at an increased risk for infection by SARS-CoV-2 and for developing a more severe form of COVID-19, independent of the possible effect of immunosuppressive medications" on the basis of epigenetic theory and data).

II.   **Legal Standard**

Under the First Step Act of 2018, federal prisoners may now petition courts directly for reduction of their sentences, and judges may grant such requests if "extraordinary and compelling reasons" support reduction. *See* First Step Act of 2018, Section 603(b), Pub. L. 115- 391, 132 Stat. 5194 (2018) (amending 18 U.S.C. § 3582(c)(1)(A)(i)) ("First Step Act"). 18 U.S.C. § 3582(c)(1)(A) now authorizes a court to modify a term of imprisonment "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Where this exhaustion requirement is met, a court may reduce the defendant's sentence if it finds that "extraordinary and compelling reasons warrant such a reduction" and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *Id.* The Court must also consider "the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable." *Id.*

III.   **Analysis**

*A. The Court's Authority to Modify the Judgment*

Mr. Sanchez submitted his request for immediate release on April 3, 2020. [Dkt. 601-2]. Understandably, he has not received a response from Warden Quay, despite numerous follow-ups. *See* [Dkts. 617-1, 617-2, 622-1, 628]. The Bureau of Prisons reports that it is giving priority in its consideration to individuals over the

age of sixty, a category for which Mr. Sanchez, who is twenty-nine, does not qualify. [Dkt. 612-1 (Ex. A: Bureau of Prisons, Frequently Asked Questions)].

"The court may not modify a term of imprisonment once it has been imposed" except under certain specified situations. 18 U.S.C. § 3582(c). One such situation is "upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf <u>or</u> the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. 3582(c)(1)(A) (emphasis added).

The parties dispute whether the Court has authority to modify Mr. Sanchez's judgment in this case where Mr. Sanchez (through his counsel) requested compassionate release on April 3, 2020, *see* [Dkt. 601-1], and the BOP has yet to rule on his request. *See* [Dkts. 606, 612]. The Second Circuit has not directly addressed the question, and district courts in the Second Circuit have come, by a multiplicity of methods, to both conclusions.[7]

---

[7] **Several courts addressing motions for compassionate release related to the COVID-19 pandemic have found that, under certain conditions, a defendant's failure to fully exhaust administrative remedies was excused.** *See United States v. Gerard Scparta, Defendant.*, No. 18-CR-578 (AJN), 2020 WL 1910481, at *4 (S.D.N.Y. Apr. 20, 2020); *United States v. Russo*, No. 16-CR-441 (LJL), 2020 WL 1862294, at *6 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, No. 19-CR-541 (JSR), -- F.Supp. 3d -- 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020); *United States v. Smith*, No. 12 CR. 133 (JFK), 2020 WL 1849748, at *4 (S.D.N.Y. Apr. 13, 2020) ; *United States v. Perez*, No. 17 Cr. 513-3, 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020); *United States v. Colvin*, No. 19 Cr. 179, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020); *United States v. Zuckerman*, No. 16 CR. 194 (AT), 2020 WL 1613943, at *2 (S.D.N.Y. Apr. 3, 2020). Other courts (or sometimes, the same courts at different times) have approached the authority to grant compassionate release absent administrative exhaustion with skepticism. *See United States v. Ogarro,* No. 18-CR-373-9 (RJS),

"Even where exhaustion is seemingly mandated by statute or decisional law, the requirement is not absolute." *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019) (affirming application of judge-made exhaustion requirement). But, here, the exhaustion requirement is imposed by statute rather than case law, so "Congressional intent is 'paramount' to any determination of whether exhaustion is mandatory." *United States v. Haney*, No. 19-CR-541 (JSR), 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992)); *see also Ross v. Blake,* 136 S. Ct. 1850, 1854-56 (2016) (holding that, "when it comes to statutory exhaustion provisions, courts have a role in creating exceptions only if Congress wants them to," and analyzing both the text and the legislative history of the Prison Litigation Reform Act (PLRA)). "Generally, Congress imposes exhaustion requirements in order to 'serve the twin purposes of protecting administrative agency authority and promoting judicial efficiency.'" *Id.* (quoting *McCarthy*, 503 U.S. at 145.); *see United States v. Ogarro*, No. 18-CR-373-9 (RJS),

---

2020 WL 1876300, at *1 (S.D.N.Y. Apr. 14, 2020); *United States v. Roberts*, No. 18-CR-528-5 (JMF), 2020 WL 1700032, at *2 (S.D.N.Y. Apr. 8, 2020); *United States v. Gross*, No. 15-CR-769 (AJN), 2020 WL 1673244, at *3 (S.D.N.Y. Apr. 6, 2020); see also *United States v. Woodson,* No. 18-CR-845 (PKC), 2020 WL 1673253, at *4 (S.D.N.Y. Apr. 6, 2020)(citing additional cases in this Circuit addressing the split in opinion).

The Third Circuit recently ruled that, in a case where fewer than 30 days passed following presentation of a request to a warden, the statute "presents a glaring roadblock foreclosing compassionate release at this point." *United States v. Raia*, -- F.3d --, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020) (denying compassionate release motion). It provides no analysis beyond this statement, however.

2020 WL 1876300, at *2 (S.D.N.Y. Apr. 14, 2020) (quoting *Woodford v. Ngo*, 548 U.S. 81, 89 (2006)).

But the context of this particular exhaustion requirement suggests that Congress also intended to promote "meaningful and prompt judicial review," even at the cost of the Bureau's authority. *Id.* (quoting *United States v. Russo*, No. 16-cr-441 (LJL), ECF No. 54, at 4 (S.D.N.Y. Apr. 3, 2020)). "[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." *Almendarez-Torres v. United States,* 523 U.S. 224, 234 (1998). Here, the section heading for the amendment to § 3582 was "Increasing the Use and Transparency of Compassionate Release." First Step Act, § 603(b), 132 Stat. at 5239; *see United States v. Gerard Scparta, Defendant.*, No. 18-CR-578 (AJN), 2020 WL 1910481, at *7 (S.D.N.Y. Apr. 20, 2020) (finding that this point supports application of equitable exception). Further, the amendment allowed defendants to move directly for compassionate release, where before only the Bureau of Prisons could so move, again demonstrating that Congress intended to expand and expedite defendants' direct access to judicial review. *Compare* 18 U.S.C. § 3582(c) (2019), *with* 18 U.S.C. § 3582(c) (2012); *cf. Ross,* 136 S.Ct. at 1857-58 (holding that the fact that PLRA replaced a "weak exhaustion provision" with an "invigorated exhaustion provision" "refute[d]" exceptions to the provision). Indeed, on the day the Act passed the U.S. Senate, co-sponsor Senator Cardin observed that the First Step Act "expands compassionate release" and "expedites compassionate release applications." 164 Cong. Rec. S7774 (daily ed. Dec. 18, 2018). Even the unusual structure of this specific requirement – which does not require full administrative

exhaustion but only an "exceptionally quick" 30-day waiting period – suggests that the 30-day rule was intended "as an accelerant to judicial review." *Haney*, 2020 WL 1821988, at *4 (quoting *Russo* at 5). [8]

In light of this Congressional purpose, the Court finds it has the discretion to waive the 30-day waiting period where strict enforcement would not serve the Congressional objective of allowing meaningful and prompt judicial review. The immediate case, where each day threatens irreparable harm to a uniquely susceptible defendant, calls for such a waiver. *See Environmental Defense Fund, Inc. v. Hardin*, 428 F.2d 1093, 1099 (D.C. Cir. 1970) ("But when administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief."), *cited by McHugh v. Rubin*, 220 F.3d 53, 60 (2d Cir. 2000); *see United States v. Colvin*, No. 19 Cr. 179,

---

[8] At least one other court has found that Congress's simultaneous CARES Act provision for the Director of the Bureau of Prisons to lengthen the maximum amount of time to place a prisoner in home confinement and silence as to § 3582(c) has implications for the status of the § 3582(c) exhaustion requirement. *See Ogarro*, 2020 WL 1876300 at *5 (citing CARES Act, Pub. L. 116-136, 134 Stat 281, § 12003(b) (Mar. 27, 2020)). This Court does not agree that such a strong interpretation can be drawn from silence, especially where, as here, the controversy has only recently emerged. *See Johnson v. Transportation Agency, Santa Clara Cty., Cal.*, 480 U.S. 616, 672 (1987) (Scalia, J., dissenting) ("The "complicated check on legislation,"… erected by our Constitution creates an inertia that makes it impossible to assert with any degree of assurance that congressional failure to act represents (1) approval of the status quo, as opposed to (2) inability to agree upon how to alter the status quo, (3) unawareness of the status quo, (4) indifference to the status quo, or even (5) political cowardice.").

2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020) ("in light of the urgency of Defendant's request, the likelihood that she cannot exhaust her administrative appeals during her remaining eleven days of imprisonment, and the potential for serious health consequences, the Court waives the exhaustion requirement of Section 3582(c)(1)(A)").

A. *"Extraordinary and Compelling Reason"*

At Congress's direction, the U.S. Sentencing Commission promulgated guidance on the circumstances constituting "extraordinary and compelling" reasons. *See* 28 U.S.C. § 944(t); U.S.S.G. 1B1.13. The U.S. Sentencing Commission has not updated its guidance since the enactment of the First Step Act. *See* U.S.S.G. 1B1.1 (Nov. 1, 2018). The Application Notes to U.S.S.G. § 1B1.13 explain that a defendant's medical condition may constitute "extraordinary and compelling" circumstances when:

> **(A) Medical Condition of the Defendant.--**
>
> **(i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.**
>
> **[or]**
>
> **(ii) The defendant is--**
>
> **(I) suffering from a serious physical or medical condition,**
>
> **(II) suffering from a serious functional or cognitive impairment, or**
>
> **(III) experiencing deteriorating physical or mental health because of the aging process,**
>
> **that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.**

U.S.S.G. 1B1.13, Commentary Application Note 1(A). Any "other" "extraordinary and compelling reason" may also justify relief. *Id.* at Commentary Application Note 1(D).

The Court finds that Mr. Sanchez has provided "extraordinary and compelling reasons" to grant his immediate compassionate release pursuant to 18 U.S.C. § 3582(C)(1). Mr. Sanchez's medical condition – specifically, his lupus – both make him both more likely to contract COVID-19 and place him at a higher risk for developing serious complications should he contract it, and "would substantially diminish his ability to provide self-care within those environments." *United States v. Smith*, No. 12 CR. 133 (JFK), 2020 WL 1849748, at *4 (S.D.N.Y. Apr. 13, 2020) (granting motion for compassionate release on the grounds of inmate's heightened risk from COVID-19) (citing U.S.S.G. § 1B1.13 comment n.1(A)(ii)); *United States v. Campagna*, No. 16 CR. 78-01 (LGS), 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020) (granting motion for compassionate release where defendant suffers from a compromised immune system); *United States v. Jepsen*, No. 3:19-CV-00073(VLB), 2020 WL 1640232, at *5 (D. Conn. Apr. 1, 2020) (same). Mr. Sanchez's compromised immune system means that he is less capable of warding off infection, and if he contracts COVID-19, is more likely to experience a severe and rapidly escalating case,[9] which would impair the ability of the staff at MDC

---

[9] *See* Amr H. Sawalha et al, *Epigenetic dysregulation of ACE2 and interferon-regulated genes might suggest increased COVID-19 susceptibility and severity in lupus patients*, Clinical Immunology (2020): 108410, https://www.sciencedirect.com/science/article/pii/S1521661620302394 ("propos[ing] that lupus patients might be at an increased risk for infection by SARS-CoV-2 and for developing a more severe form of COVID-19, independent of

**Brooklyn to identify and respond to Mr. Sanchez's medical needs. The Court finds that these exigencies establish an extraordinary and compelling reason to grant Mr. Sanchez's immediate compassionate release.**

**The Government does not oppose Mr. Sanchez's motion on the grounds that Mr. Sanchez has not shown extraordinary and compelling reasons: the Government states that, "should [Mr. Sanchez] exhaust his administrative remedies, and renew his motion to modify his sentence to time served, the government would defer to the Court as to whether the defendant's concerns about the COVID-19 pandemic constitute 'extraordinary and compelling reasons' warranting a sentence modification." [Dkt 606 at 3-4].** *See Smith*, **2020 WL 1849748, at \*4.**

### B. *Policy Statement: Danger to Others or the Community*

**The Commission's policy statement provides for granting a sentence reduction only if "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). These factors include "the nature and circumstances of the offense charged," "the history and characteristics of the person," including "the person's character, physical and mental condition, family ties, . . . community ties, past conduct, history relating to drug or alcohol abuse, [and] criminal history," and "the nature and seriousness of**

---

**the possible effect of immunosuppressive medications" on the basis of epigenetic theory and data).**

the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

During a search incident to Mr. Sanchez's arrest in the instant action, law enforcement located a revolver and four rounds of ammunition in a shoe box in the master bedroom closet, and he pleaded guilty to possession of a firearm in connection with the offense. [Dkt. 438 at ¶36]. Mr. Sanchez's criminal history includes a nine-year-old violation of a protective order and criminal possession of a weapon. *Id.* at ¶¶55-56. In this case, he accepted responsibility for between 100 and 200 grams of cocaine. [Dkt. 314 (Plea Agreement)]. The Court finds that this history is extremely serious, however, the Court finds that in light of the present circumstances, Mr. Sanchez does not pose a danger to others. While Mr. Sanchez has previously violated a protective order, that violation is more than nine years in the past and occurred when he was twenty. While he pleaded guilty to possessing a firearm in furtherance of a drug offense, there is no evidence that Mr. Sanchez used the gun during the transactions or at any other time. *United States v. Beck*, No. 1:13-CR-186-6, -- F. Supp. 3d. -- , 2019 WL 2716505, at *10 (M.D.N.C. June 28, 2019) ("While she and her husband kept firearms in their home in connection with their drug business, an undoubtedly dangerous crime, there was no evidence or indication that she ever used or pointed a gun at anyone or that she threatened anyone with a firearm.").

The Court also finds that Mr. Sanchez is not a danger to the community during the pandemic because he can self-quarantine at his residence, because he

will be on home-confinement, and because he is uniquely critically incentivized to avoid contact with others in order to protect himself.

### C. *18 U.S. § 3553(a) factors*

Finally, granting Mr. Sanchez's request for compassionate release is consistent with the 3553(a) sentencing factors, in light of post-offense developments. *Pepper v. United States*, 562 U.S. 476, 490-93 (2011). The Eighth Amendment prohibition on cruel and unusual punishment includes unreasonable exposure to dangerous conditions in custody. U.S. Const. amend. VIII; *Helling v. McKinney*, 509 U.S. 25 (1993) (also stating, in dicta, "Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms."). The sentencing purpose of "*just* punishment" cannot warrant a sentence that includes exposing a particularly vulnerable individual to a life-threatening illness which threatens him uniquely.

### IV. Conclusion and Orders

Mr. Sanchez's motion for compassionate release is GRANTED. Pursuant to 18 U.S.C. § 3582(c), the Court modifies Mr. Sanchez's term of incarceration to time served, and modifies the conditions of his supervised release as follows:

1. Mr. Sanchez's period of supervised release is increased from three to four years.

2. Upon release from imprisonment, Mr. Sanchez shall be on supervised release for a total term of four years, under home detention subject to GPS monitoring for the first thirteen months of his release.

**As the term of home confinement is in lieu of imprisonment the Court does not expect Mr. Sanchez to seek a modification of this condition for any reason other than scheduled and emergency medical treatment verified by a treating healthcare provider to the satisfaction of Probation and the Court in advance to the extent feasible.** *See* **18 U.S.C. § 3563(d)(19). A formal amended judgment will follow.**

**A finding of any failure, no matter how slight, to comply with *any* of the conditions of supervised release, including any instruction of the United States Probation Office, will likely result in a revocation of the supervised release and the imposition of a term of incarceration.**

**It is the Court's earnest hope that, after his period of home detention, Mr. Sanchez will be a productive law-abiding member of society. The Court is confident that Mr. Sanchez has the necessary tools to succeed.**

**IT IS SO ORDERED.**

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

**Dated this day in Hartford, Connecticut: April 22, 2020**